UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DR. STEVEN L. CONDRON,<br><br>Plaintiff,<br><br>vs.<br><br>AVERA MCKENNAN, DR. CHRIS HURLEY,<br><br>Defendants. | 4:21-CV-04135-RAL<br><br><br>OPINION AND ORDER GRANTING<br>MOTION FOR SUMMARY JUDGMENT |

Plaintiff, Dr. Steven Condron ("Dr. Condron"), filed a nine-count Complaint against Avera McKennan ("Avera") and Dr. Chris Hurley ("Dr. Hurley") (collectively, "Defendants"). The Complaint initially alleged Avera impermissibly discriminated and retaliated against Dr. Condron, that Dr. Hurley tortiously interfered with Dr. Condron's employment contract with Avera, and that Dr. Hurley and Avera defamed Dr. Condron. Doc. 1. In February 2023, Defendants moved for summary judgment on all counts of the complaint, Doc. 36, at which point Dr. Condron chose to not oppose the Court granting summary judgment in favor of the Defendants on Counts 3 through 7 and Count 9, Doc. 57 at 1 n.1.

Dr. Condron opposes summary judgment on Counts 1, 2, and 8, which allege disability discrimination in violation of the South Dakota Human Relations Act of 1972 ("SDHRA"), disability discrimination against Avera in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and defamation against Defendants by libel and slander. Doc. 1 ¶¶ 109–25, 174–78; Doc. 53 at 30. Avera argues Dr. Condron cannot establish his prima

1

facie case for disability discrimination or, in the alternative, cannot prove that Avera's reason for his termination is pretextual under the framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Doc. 37 at 13. Further, Defendants contend that Dr. Condron's defamation claim fails because Dr. Hurley's remarks regarding Dr. Condron were hyperbolic. Doc. 37 at 24–25; Doc. 59 at 25–30. For the reasons discussed below, the Court enters summary judgment in favor of Defendants on all Counts.

## I.      Facts in Light Most Favorable to Dr. Condron

Dr. Condron began as a physician in Avera's Gastroenterology Group ("GI Group") in 2008. Doc. 1 ¶¶ 15, 29. In November 2018, Dr. Condron expressed to Chad Bare, Avera Specialty Hospital's Vice President, a desire to attend a treatment program at the Acumen Institute. Doc. 1 ¶ 32. Dr. Condron then discussed his mental health concerns with Dr. Tad Jacobs, the Chief Medical Officer of the Avera Medical Group at the time; John Mathison, the Vice President of Avera's Specialty Clinics; and Christa Henderson, the Avera Medical Group Human Resources Officer. Doc. 1 ¶ 35. After that meeting, Dr. Condron took leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA") on November 26, 2018, and began treatment at the Acumen Institute on December 3, 2018. Doc. 1 ¶ 39; Doc. 41-1 at 6. Dr. Condron received treatment through December 14 but remained on FMLA leave until January 15, 2019. Doc. 1 ¶ 42; Doc. 41-1 at 6.

When Dr. Condron returned from FMLA leave, he worked with Avera to implement his return-to-work plan, which was a proposed work schedule consistent with recommendations from the Acumen Institute. Doc. 56-7 at 4–6; Doc. 57-8 at 2–3; Doc. 1 ¶¶ 42–44. Under the plan, Dr. Condron would maintain limited clinic hours and designated hours for administrative work before

2

easing into a new permanent schedule that was a reduced version of his pre-treatment workload. Doc. 56-7 at 4–6; Doc. 1 ¶¶ 42–44.

Under the return-to-work plan, Dr. Condron decreased his work hours, which naturally caused his productivity to decrease. This reduction in work also triggered discussions about his salary. Doc. 56-15 at 3. For example, in January of 2019, Avera's Specialty Clinics Vice President Mathison noted Dr. Condron's proposed schedule would cost Avera "a few $100k." Doc. 56-8 at 2; Doc. 57 at 6. Again, in September of 2019, Mathison similarly mentioned Dr. Condron's salary, asking Human Relations Officer Henderson the following: "What am I able to do with his salary? He has not increased his volumes to the point where they are needed and he is at the end of his contract year. At a minimum, I would like to 90/90[1] him. What am I able to do?" Doc. 56-15 at 3; Doc. 57 at 6. Mathison also asked about Dr. Condron's production "volumes" in May of 2020. Doc. 56-25. Despite these conversations about compensation, Avera never decreased Dr. Condron's salary.[2] Doc. 57 at 6.

The next critical events related to Dr. Condron's discrimination claims occurred in the summer of 2020, over a year after Dr. Condron returned to work at Avera. Dr. Condron's work relationship with Dr. Hurley, another physician in the GI Group, was strained and seemed to worsen in 2020. See Doc. 56-26. On May 12, 2020, Dr. Hurley made comments at the weekly GI Group meeting about scheduling and physician duties, which Dr. Condron interpreted as directed toward him. See Doc. 56-26. After the meeting, Dr. Hurley emailed Avera Specialty Hospital

---

[1] 90/90-ing refers to decreasing a physician's production threshold and salary by 10%. Doc. 56-2 at 28.

[2] Although his salary did not decrease, Dr. Condron's production incentive bonus decreased with his decreased productivity. Doc. 57 at 6. Dr. Condron does not argue that a bonus commensurate with his work output was inappropriate, even though it was a smaller sum than he had earned in the past.

Vice President Bare and Specialty Clinics Vice President Mathison to express additional concerns about Dr. Condron, writing the following:

> [Dr. Condron] continues to operate as a solo practitioner – he tells the group what he is going to do, no dialogue, zero communication. . . . Dr Condron unapologetically says he is going to do his thing and the group just has to accept that. He fails to understand that whatever he declines falls to others in the group – he talks about his personal safety as well as him choosing to limit what he does – but he takes phone calls from NW Iowa surgeons on week[ends] that I am on call and arranges for a procedure…but doesn't talk to his direct partners, at all, ever.

Doc. 56-27.

The next day, May 13, 2020, Dr. Condron emailed Bare, Mathison, Dr. Post, Henderson, and Avera's CEO David Flicek to make a formal complaint against Dr. Hurley; the complaint referred to comments during the prior day's meeting and other long-standing workplace issues between the two doctors. Doc. 56-26. Dr. Condron also alleged that Dr. Hurley was improperly accessing patient files, and Avera launched an audit in response. Doc. 62 at 20. Ultimately, the audit found no evidence of the file-access violations, but Dr. Condron still disputes the audit's accuracy.[3] Id.; Doc. 54, ¶ 44.

Doctors Hurley and Condron continued to get along poorly after their respective complaints to Avera administration. Dr. Hurley made additional comments to Mathison, Bare, Dr. Post, and Henderson about Dr. Condron on June 1, 2020, expressing concerns about Dr. Condron's lack of communication and collegiality. Doc. 56-30. In June 2020, Dr. Hurley remarked that Dr. Condron engages in "[n]o communication w/ partners-zero." Doc. 56-31. Dr. Hurley also took

---

[3] Dr. Condron's belief that the audit results are inaccurate is unsubstantiated and speculative and, therefore, insufficient to create a fact issue and prevent entry of summary judgment. See Gruttemeyer v. Transit Auth., 31 F.4th 638, 646 (8th Cir. 2022) (requiring the record to show more than speculation to support the jury's verdict in favor of plaintiff). Dr. Condron did not participate in the audit, makes no specific allegations about how or why the results are inaccurate, and has not cited to anything in the record to suggest the results are inaccurate.

4

offense at Dr. Condron's supposed choice to ignore Dr. Hurley's greeting in the hall on June 4, 2020; Dr. Condron claims he did not intentionally ignore Dr. Hurley and must not have seen him. Doc. 62 at 20; Doc. 56-6 at 7.

On June 2, 2020, during a regular weekly meeting of the GI Group, Dr. Condron made comments about the May 12, 2020 meeting in which Dr. Hurley had purportedly targeted Dr. Condron. Doc. 56-6 at 7–8. Avera claims that discussing the prior meeting at the June meeting disobeyed Avera's directive that Dr. Condron would not raise the events of that meeting until Avera had the opportunity to investigate the matter; Dr. Condron claims he was given no instruction forbidding him to discuss the May 12 meeting. Id. There are also disputes about whether Dr. Condron came with prepared notes from which he read; Avera believes Dr. Condron on June 2, 2020, gave deliberate and rehearsed comments, but Dr. Condron adamantly denies having had a script. Id. Despite these factual uncertainties, however, neither party disputes that Dr. Condron brought up the May 12 meeting or that June 2 was the last weekly GI Group meeting Dr. Condron attended. Id.

In addition to failing to get along with Dr. Hurley and no longer attending weekly meetings, Dr. Condron's behavior drove other physicians to make complaints. For example, at the beginning of July 2020, Dr. Condron got into a heated conversation with Dr. Jennifer McKay, a physician outside the GI Group. Doc. 41-1 at 16. Dr. Condron harshly criticized Dr. McKay when discussing treatment options for a patient; he told Dr. McKay that her suggestion was "tantamount to shooting [the patient], to killing her," and the discussion ended with Dr. McKay crying. Id.

Other physicians, including Doctors Hill Jensen, Feyen, and Towner Lapp, also expressed some concerns in June 2020 about Dr. Condron, which Avera administration incorporated into its investigation. Doc. 56-31. Meeting notes from July 28, 2020, indicate that Bare, Mathison, Dr.

5

Post, and Henderson held a meeting with other GI Group physicians to discuss Dr. Condron and concerns related to him and his ability to get along with others in the workplace. Doc. 56-35. Avera has produced notes from those meetings, but Dr. Condron contests their probative value, emphasizing his belief that many of those statements do not directly refer to him, have unattributed authors, or are from speakers who do not remember making the statements. See id.

During the period in which the complaints and disputes arose between Dr. Condron and others in the workplace, including Dr. Hurley and Dr. McKay, administration continued to discuss the proper course of action. Ultimately, Bare, Mathison, Dr. Post, and Henderson recommended that Avera CEO Flicek terminate Dr. Condron for his inability to get along with others and for causing an unhealthy work environment, though Dr. Condron believes this reason was not the true motivation behind firing him. Doc. 57 at 17. Nonetheless, Flicek terminated Dr. Condron on August 31, 2020, in reliance on the recommendation, even though he had little information about the specifics for the recommendation. Doc. 1 ¶ 1; see Doc. 56-1 at 4.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); McManemy v. Tierney, 970 F.3d 1034, 1037 (8th Cir. 2020). Rule 56(a) places the burden on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed.

R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials" in their pleading but "must set forth specific facts showing that there is a genuine issue for trial." Gacek, 666 F.3d at 1145–46 (citing Anderson, 477 U.S. at 256); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Taylor v. Riojas, 141 S. Ct. 52, 53 n.1 (2020) (per curiam); Intel Corp. Inv. Pol'y Comm. v. Sulyma, 140 S. Ct. 768, 779 (2020). However, "[w]hile we are required to make all reasonable inferences in favor of the nonmoving party in considering summary judgment, we do so without resort to speculation." Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006).

Of course, cases alleging employment discrimination or violations of the ADA sometimes involve two irreconcilable versions of core facts and thus material disputes of fact making summary judgment improper. In this case, even resolving all such fact disputes for Dr. Condron, summary judgment is appropriate.

## III.    Analysis

### A. Counts 1 and 2: Disability Discrimination

Count I of the Complaint alleges Avera engaged in "unfair or discriminatory practices in violation of" SDCL § 20-13-10 of the SDHRA. Doc. 1 ¶ 114. Count II alleges Avera "discriminated against [Dr. Condron] on the basis of his disability with respect to the terms,

7

conditions, and privileges of his employment" in violation of § 12112 of the ADA.  Doc. 1 ¶ 122.

Discrimination claims arising under the SDHRA are analyzed identically to their federal ADA

counterparts.  Doc. 37 at 12; see Alexander v. Avera St. Luke's Hosp., 768 F.3d 756, 765 (8th Cir.

2014) (applying ADA interpretations to language also in the SDHRA and explaining how, "[i]n

interpreting the SDHRA, the South Dakota Supreme Court has followed federal court decisions

construing analogous federal anti-discrimination statutes"); see also Axness v. Aqreva LLC, 118

F. Supp. 3d 1144, 1157 (D.S.D. 2015) ("South Dakota courts examine claims under SDCL § 20-

13-10 under a standard identical to that applied to Title VII claims.") (citing Huck v. McCain

Foods, 479 N.W.2d 167, 169 (S.D. 1991)); Fish v. Ristvedt, 192 F. Supp. 2d 1024, 1027–28

(D.N.D. 2002) (indicating that "[c]ourts often look to Title VII for guidance in interpreting similar

terms under the ADA").  Accordingly, the analysis below applies equally to the two discrimination

claims.

## 1.  Dr. Condron has failed to provide direct evidence of discrimination.

In cases alleging disability discrimination, the proper analysis depends on whether there is

direct or indirect evidence of discrimination.  See Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537,

544 (8th Cir. 2018).  Direct evidence refers to evidence that strongly demonstrates the causal

connection between the plaintiff's disability and the adverse action, even if the evidence is

circumstantial.  See Lipp, 911 F.3d at 543 (explaining direct evidence "directly reflect[s] the

[defendant's] alleged discriminatory attitude" (cleaned up and citations omitted)); Othman v. City

of Country Club Hills, 671 F.3d 672, 675 (8th Cir. 2012) (indicating that direct evidence "show[s]

a specific link between the alleged discriminatory animus and the challenged decision" (cleaned

up and citations omitted)); Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1034 (8th Cir.

2007) (noting direct evidence "is not the converse of circumstantial evidence").  Direct evidence

is "sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Othman, 671 F.3d at 675 (cleaned up and citations omitted).

The mere occurrence of an adverse employment action following a protected activity generally does not constitute direct evidence sufficient for a finding in favor of the plaintiff. See Sisk v. Picture People, 669 F.3d 896, 900 (8th Cir. 2012). In cases relying on timing to support a claim of employment discrimination, "the temporal proximity must be very close" to be direct evidence. Sisk, 669 F.3d at 900 (cleaned up and citation omitted) (finding two months was not close enough to support a finding of retaliation); see also Kipp v. Missouri Highway and Transp. Com'n, 280 F.3d 893, 897 (8th Cir. 2002) (explaining "the interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link"). Nonetheless, the timing between a protected activity and an adverse action can "supply the extra quantum of evidence to satisfy the causation requirement." Smith v. Allen Health Sys., 302 F.3d 827, 832 (8th Cir. 2002); see also Sprenger v. Fed. Home Loan Bank, 253 F.3d 1106, 1113–14 (8th Cir. 2001) ("look[ing] for proximity in conjunction with other evidence" to decide "a matter of weeks" was too much time to prove pretext).

Here, Dr. Condron contends he has presented direct evidence of disability discrimination. He asserts the statements by Mathison, the Vice President of Avera McKennan Specialty Clinics, about Dr. Condron's compensation constitute direct evidence. Doc. 57 at 21-22. Mathison had written in September of 2019 that he wanted to "90/90" Plaintiff and that Avera was losing "a few $100k" from Dr. Condron's schedule. Doc. 56-8 at 2; 56-15 at 3. However, these remarks refer exclusively to Dr. Condron's compensation as incommensurate with his reduced schedule; neither

comment mentions terminating Plaintiff as the proper solution to his decreased productivity. Therefore, the comments themselves provide no specific causal link to Dr. Condron's ultimate termination in August of 2020 and cannot support a jury finding on the issue.

Moreover, the timing of Dr. Condron's termination after implementing his reduced schedule, without more, is not direct evidence of discrimination. More than eighteen months had passed between Dr. Condron's return from the Acumen Institute on a reduced schedule and his termination, and months had passed between Mathison's salary comments and Dr. Condron's termination. Any implication that either of those events caused the termination runs contrary to logic and Eighth Circuit precedent. See, e.g., Sisk, 669 F.3d at 900 (finding two months between the protected activity and adverse action was too much time to be direct evidence of retaliation); Kipp, 280 F.3d at 897 (same); Smith, 302 F.3d at 833 (finding two weeks was "barely" enough). Further, even if the comments from Mathison were motivated by discriminatory animus, the months-long delay before termination is far too long to "supply the extra quantum of evidence to satisfy the causation requirement." Smith, 302 F.3d at 832. Accordingly, Dr. Condron has failed to provide direct evidence of disability discrimination.

## 2. Dr. Condron has failed to present indirect evidence meeting the prima facie burden to show discrimination.

Absent direct evidence, courts apply the McDonnell Douglas burden-shifting analytical framework to discrimination cases, including those brought under the ADA. Lipp, 911 F.3d at 544 (8th Cir. 2018); see also McDonnell Douglas, 411 U.S. at 802–03 (establishing a burden shifting test for Title VII discrimination claims); Kincaid v. City of Omaha, 378 F.3d 799, 804 (8th Cir. 2004) (applying the McDonnell Douglas analysis to an ADA discrimination claim). Under the McDonnell Douglas framework, a plaintiff must first present a prima facie case of

discrimination to survive summary judgment. Id. The prima facie showing creates a presumption of discrimination and shifts the burden to the defendant to offer a legitimate, nondiscriminatory reason for its action. Id. If the defendant presents a nondiscriminatory motive, the burden shifts back to the plaintiff to show the defendant's proffered reason is really pretext for unlawful discriminatory action. Id. This Court addresses each step of the analysis in turn.

    **a. Dr. Condron fails to show causation establishing a prima facie case of discrimination.**

To make a prima facie showing of disability discrimination to survive summary judgment, the plaintiff must prove (1) he is disabled, (2) he is qualified for the position, and (3) he suffered an adverse employment action because of his disability.[4] Kincaid, 378 F.3d at 804. Making a prima facie case is not a particularly "onerous" thing to do. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). Nonetheless, a plaintiff must still provide more than speculation in support of his claim that his disability caused his termination. See Gruttemeyer, 31 F.4th at 646 (requiring the record to show more than speculation to support the jury's verdict in favor of plaintiff).

Dr. Condron suffered from depression which, for purposes of this motion, constitutes a "disability" within the definitions provided under the ADA and SDHRA. Doc. 1 ¶¶ 29, 111, 119. The parties do not dispute that Dr. Condron was qualified for his position. There is also no question that Dr. Condron suffered an adverse employment action; he was terminated from his job at Avera.

---

[4] In the Eighth Circuit, it is unclear whether a "motivating factor" or "but-for" causation standard is required in disability discrimination cases to show the adverse employment action was "because of" the plaintiff's disability. See Anderson v. KAR Global, 78 F.4th 1031, 1039 n.1 (8th Cir. 2023) (refraining from deciding which causation standard applies in a disability discrimination case); Gruttemeyer, 31 F.4th at 648 (explaining that "[t]he jury needed only to conclude that disability was one motivating factor for termination, . . . and that [defendant] would not have discharged [plaintiff] but for his disability"). The present case does not require this Court to decide the required causation standard, either; the result would be the same under either test because the Plaintiff has failed to meet even the less demanding "motivating factor" standard.

Doc. 1 ¶ 1. However, the parties disagree on whether evidence of causation for the prima facie case is present.

Dr. Condron's evidence to demonstrate the causal relationship between his disability and his termination is, at best, speculative. As before, Dr. Condron cites Mathison's remarks in September of 2019 about how Dr. Condron was going to cost Avera due to his decreased workload and should have a ten percent salary decrease as support for his assertion that his disability, and the corresponding decrease in his workload and productivity to accommodate his disability, caused his termination. Doc. 57 at 1–2, 6, 12. But Mathison's comments do not refer to firing Dr. Condron at all; rather, they only indicate an intention to decrease his salary,[5] which is consistent with Mathison's job duties to oversee operations and assist in making staffing decisions. Doc. 56-2 at 5–7. Therefore, Mathison was properly inquiring into options for adjusting Dr. Condron's salary, and it would be unreasonable to infer *impermissible* animus from comments about *permissible* actions. See Sprenger, 253 F.3d at 1114 (refusing to find pretext even though employer asked plaintiff about taking disability retirement because "a company may make reasonable inquiry into retirement plans").

Further, Mathison's comments to which Dr. Condron cites were made four, eleven and eighteen months before Avera terminated Dr. Condron's employment. Even if the desire to decrease Dr. Condron's pay were discriminatory animus, it would not follow that the subsequent termination, which occurred months after the last of any productivity-related comments and was

---

[5] Avera ultimately did not decrease Plaintiff's salary during his tenure at the hospital, but neither party contends decreasing Dr. Condron's salary consistent with his decreased hours and productivity would have been inappropriate. See also Thompson v. Microsoft Corporation, 2 F.4th 460, 469 (5th Cir. 2021) (explaining "[a] disabled employee has no right . . . to receive the same compensation as he received previously" (quoting Jenkins v. Cleco Power LLC, 487 F.3d 309, 316 (5th Cir. 2007))).

based on the joint recommendation of three other administrators, was also the result of such animus. The lengthy lapse in time makes it difficult to infer that any discriminatory intent caused the decision to terminate Dr. Condron's employment. No reasonable jury could find Dr. Condron's disability or scheduling accommodations were the reason Avera decided to fire him after such lengthy temporal gaps; indeed, it is counterintuitive that Mathison would feel so strongly about Dr. Condron's decrease in productivity that he would wait over a year from his initial concerns to coax other administrators at Avera to fire Dr. Condron, rather than immediately decrease Dr. Condron's salary and thereby resolve his financial concerns. Dr. Condron's speculation that the termination was the result of decreased productivity, without more, is not enough for his claim to survive summary judgment. See Gruttemeyer, 31 F.4th at 646 (indicating that judgment as a matter of law is appropriate in an ADA discrimination case where "no proof beyond speculation" could support the verdict).

Dr. Condron also posits that his prior employment record, which included pre-disability complaints but no pre-disability disciplinary actions, is additional evidence from which an inference of discrimination arises. Dr. Condron argues that, because Avera took no disciplinary action until after his claim of disability, his disability must have caused his termination. More than a year and a half had passed, however, between implementing Dr. Condron's return-to-work plan and his eventual termination. This lapse of time between his disability-related schedule change and his employment termination does not support that the two events were causally related, and Dr. Condron presents no additional evidence to causally connect the two. See Smith, 302 F.3d at 833 (deciding two weeks "barely . . . establish[ed] causation" for a prima facie case of Family Medical Leave Act retaliation). The record also shows that the complaints received post-disability were different in nature and gravity from those in Dr. Condron's file before he changed his work

13

schedule. For instance, the intense conversation that led Dr. McKay to tears was an identifiably serious post-disability complaint for which the record does not provide any comparable pre-disability complaint.

The burden for making out a prima facie case of disability discrimination under McDonnell Douglas is not onerous, Burdine, 450 U.S. at 253, and this Court must view the evidence in the light most favorable to the nonmoving party, Twymon v. Wells Fargo & Co., 462 F.3d 925, 934 (8th Cir. 2006). Nonetheless, Dr. Condron cannot rely on speculation nor expect this Court to make unreasonable inferences in favor of him. See id.; Gruttemeyer, 31 F.4th at 646. Mathison's salary-related comments, Dr. Condron's prior disciplinary records, and the timing of his termination do not constitute evidence that his disability was a motivating factor of termination of his employment. Dr. Condron has not provided sufficient evidence to establish a prima facie case of disability discrimination. Even if Dr. Condron had showed causation, however, Avera would still be entitled to summary judgment at the pretext stage of the analysis.

**b. Avera's nondiscriminatory reasons for terminating Dr. Condron's employment are sufficient to meet its burden under McDonnell Douglas.**

After the plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to demonstrate that its actions were motivated by nondiscriminatory reasons. Lipp, 911 F.3d at 544; Kincaid, 378 F.3d at 804. Nondiscriminatory reasons may include behavioral conduct or interpersonal relationships in the workplace. See Bharadwaj v. Mid Dakota Clinic, 954 F.3d 1130, 1135 (8th Cir. 2019) (accepting plaintiff's "inability to get along with others" as a nondiscriminatory reason for defendant's actions).

Avera has met its burden to demonstrate its reason for terminating Dr. Condron was motivated by legitimate, nondiscriminatory purposes. Doc. 37 at 16; Doc. 53 at 23. Avera claims

Dr. Condron was terminated primarily because of relationship issues with others at Avera, proffering nine specific bases explaining Dr. Condron's attitude, the issues arising in his relationships with other Avera employees, and the effect of those relationships on the overall work environment at Avera and within the GI Group. Doc. 37 at 16. Avera identified Dr. Condron's "general lack of communication," failure to attend meetings, "lack of desire to come to consensus-based decisions," and "desire to not be part of the GI Group based on his lack of communication and behavior" as reasons for the deteriorating relationships and terminating his employment. Doc. 37 at 16. In short, Dr. Condron had become unable or unwilling to be part of a cooperative work environment. Avera also submitted information that Dr. Condron was the subject of complaints from other specialists, had a "lack of collegial focus with other specialists besides his physician partners," created issues bringing new doctors to the GI Group, and "disregard[ed] administration's directives," all of which reflect difficulty engaging with others in the workplace. Doc. 37 at 16.

These reasons, which center around inability to get along with others in the workplace constitute nondiscriminatory reasons for Avera to terminate Dr. Condron. See Bharadwaj, 954 F.3d at 1135. Dr. Condron does not contend the reasons are insufficient to meet Avera's burden under McDonnell Douglas, but argues that they are pretextual. Doc. 37 at 16; Doc. 53 at 23.

**c. Dr. Condron failed to provide sufficient evidence to demonstrate Defendant's proffered reasons are mere pretext.**

If the defendant provides legitimate, nondiscriminatory reasons for its action, the burden shifts back to the plaintiff to show the proffered reasons are pretextual. Kincaid, 378 F.3d at 804. In the Eighth Circuit, a plaintiff may raise an issue of material fact at the pretext stage by demonstrating the defendant's proffered reasons are "unworthy of credence because [they have]

15

no basis in fact." Schaffhauser v. UPS, 794 F.3d 899, 904 (8th Cir. 2015) (cleaned up and citation omitted). A plaintiff may also "create a genuine issue of material fact regarding whether an employer's proffered explanation is pretext" by "persuading the court that a prohibited reason more likely motivated the employer." Anderson, 78 F.4th at 1038 (quoting Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc)).

### i.   Unworthy of Credence

A plaintiff may raise a material question of fact at the pretext stage by demonstrating the defendant's purported reasons for taking the adverse action against the plaintiff have "no basis in fact." Schaffhauser, 794 F.3d at 904. Here, Dr. Condron claims two of Avera's reasons have no factual basis and, therefore, summary judgment is inappropriate. First, Dr. Condron contends nothing ties him to Avera's problem bringing new physicians to the GI Group. Doc. 57 at 24–25. Although the record may not demonstrate how Dr. Condron's behavior caused difficulties of recruiting new physicians to the GI Group, there is evidence in the record that Avera had reason to associate Dr. Condron with the problem; according to notes from the July 28, 2020, meeting with the GI Group to discuss Dr. Condron and concerns related to him, one discussion point was recruitment difficulties. Doc. 56-35. The meeting comments, coupled with other evidence in the record that Dr. Condron created an unhealthy work environment, could constitute a factual basis from which Avera could determine Dr. Condron was deleterious to Avera's recruiting efforts.[6]

---

[6] Dr. Condron contends the meeting notes are untrustworthy because the bulleted statement referring to recruiting physicians did not directly refer to him, it was unclear who made the statement, and the members of the meeting—which did not include Dr. Condron—did not remember discussing that point around two years later in depositions. Doc. 57 at 16–17, 29; Doc. 56-2, -3, -4, -9, -10, -13, -14. Importantly, these contentions suggest Avera's factual basis for terminating Dr. Condron's employment on recruitment grounds was not strong, but they do not show Avera had "no factual basis" for believing Dr. Condron created recruitment issues. After all, ample evidence exists that Dr. Condron had a poor relationship with Dr. Hurley and stopped attending GI Group weekly meetings. In a relatively small GI Group, Avera could legitimately

Second, Dr. Condron argues there is a genuine issue of material fact about whether he received a direct instruction to refrain from discussing the May 12 meeting with others until Avera could address the issue. Doc. 53 at 25. Dr. Condron claims he was not so instructed, Doc. 56-6 at 8, but Avera maintains it gave that directive, Doc. 41-10 at 16. Importantly, a purported reason for engaging in a particular adverse employment action only creates a question of material fact when it has no basis in fact. See Schaffhauser, 794 F.3d at 904 (explaining plaintiff can raise a material question of fact by showing the proffered explanation had "no basis in fact"). Here, Avera has a basis in fact to believe it gave Dr. Condron a directive, which is evidenced by an email dated June 2, 2020, from Bare to Mathison, Dr. Post, and Henderson that explains Bare "did tell [Dr. Condron] previously not to address the group in regards to the previous meeting in question until we had an opportunity to work through the situation. He clearly disregarded that request." Doc. 41-10 at 16. Accordingly, even if Dr. Condron disputes the factual accuracy of the directive, Avera had some basis in fact to believe Dr. Condron violated a directive. This does not give rise to a genuine issue of material fact to survive summary judgment.

Avera had some factual basis to terminate Plaintiff for making it difficult to recruit new physicians or for disobeying a directive, even if the facts underlying those beliefs are, arguably, weak support. Dr. Condron has little to present to refute the many other facts pointing to his relationship issues. Because Dr. Condron has failed to show Avera's reasons had "no factual basis," he has not demonstrated the existence of a genuine dispute of material fact at the pretext stage of the analysis.

---

worry about whether such friction with one physician could make recruiting and retention of new GI physicians more difficult. Accordingly, Dr. Condron has failed to raise a genuine issue of material fact. See Schaffhauser, 794 F.3d at 904 (explaining plaintiff can raise a material question of fact by showing the proffered explanation had "no basis in fact").

### ii.   Prohibited Reason

A plaintiff may also show pretext by demonstrating an impermissible "reason more likely motivated the employer" than the reasons offered.  Anderson, 78 F.4th at 1038.  To accomplish this, the plaintiff may demonstrate the defendant violated its own policies, engaged in disparate treatment of the plaintiff and similarly situated employees, or gave inconsistent answers regarding the motive behind the action taken.  EEOC v. Prod. Fabricators, Inc., 763 F.3d 963, 970 (8th Cir. 2014); Lake v. Yellow Transp., 596 F.3d 871, 874 (8th Cir. 2010).  Here, Dr. Condron has failed to provide evidence of this kind to suggest a prohibited reason motivated Avera's decision to terminate him.

Dr. Condron has failed to demonstrate Avera "treated similarly-situated employees in a disparate manner."  Under Eighth Circuit precedent, disparate treatment is difficult to prove; other employees who were treated differently from the plaintiff must be "similarly situated in all relevant respects" to the plaintiff to show pretext.  Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014); see also Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (describing the similarly-situated standard as "rigorous").  In practice, the Eighth Circuit has interpreted this standard to require the plaintiff to identify "potential comparators [who] have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  Schaffhauser, 794 F.3d at 904 (cleaned up and citation omitted); see also Lindeman v. St. Luke's Hosp. of Kan. City, 899 F.3d 603, 606 (8th Cir. 2018) (explaining misconduct "must be of comparable seriousness" for employees to be similarly situated and determining plaintiff was not similarly situated to other employees who had less disciplinary history (cleaned up and citation omitted)); Lowery v. Hazelwood Sch. Dist., 244 F.3d 654, 660 (8th Cir. 2001) (affirming summary judgment for

defendant and explaining "employees whose infractions are not documented in the record[ and] employees who were disciplined for less serious infractions" were not similarly situated to plaintiff).

Here, Avera did not treat Dr. Condron disparately from any other physician. Dr. Condron contends he was treated differently from other doctors at Avera when he was fired for creating an unhealthy work environment because other doctors, including other GI Group physicians, were also subject to complaints by other staff members. Dr. Condron fails to recognize the qualitative difference between the complaints alleged against the various other physicians and those charged against him, though.[7] Most relevant is Dr. Condron's interaction with Dr. McKay, a non-GI Group physician. Dr. McKay had a conversation with Dr. Condron in which he claimed her suggestion for treating a patient was "tantamount to shooting [the patient], to killing her," and the discussion ended with Dr. McKay crying. Doc. 41-1 at 16. The record does not identify any other physician engaging in interactions of "comparable seriousness" with the discussion Dr. Condron had with Dr. McKay.[8] Categorizing doctors subject to commonplace complaints from non-physician staff as "similarly situated in all relevant respects" to or indistinguishable from Dr. Condron's situation is inconsistent with fact and precedent. See Lindeman, 899 F.3d at 606 (requiring misconduct be of "comparable seriousness" for employees to be similarly situated).

---

[7] For example, Plaintiff makes multiple attempts to characterize the complaints charged against Dr. Hill Jensen as qualitatively similar to complaints made against him, including his interaction with Dr. McKay. Importantly, the complaints against Dr. Hill Jensen were from staff members—and not other physicians in or outside of the GI Group—who did not report being driven to tears. Such differences are "mitigating or distinguishing circumstances." Doc. 57 at 10–12; Schaffhauser, 794 F.3d at 904.

[8] Dr. Condron emphasizes that his medical advice was correct and that Dr. McKay also did not conduct herself in the best manner. Doc 56-6 at 9; Doc. 57 at 30. However, this does not diminish the severity of Dr. McKay's complaint to make Plaintiff similarly situated with other physicians. To be certain, "the ADA confers no right to be rude." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

Further, these complaints compound with additional conduct of Dr. Condron, such as not attending meetings, in ways that distinguish him from other physicians at Avera. See Doc. 59 at 18; Lindeman, 899 F.3d at 606 (requiring employees to have similar disciplinary history to be similarly situated).   Avera argues Dr. Condron was terminated for more reasons than the complaints, and the record does not indicate that any other Avera physician had a similar list of disfavored conduct that would make him or her "similarly situated in all relevant respects" to Dr. Condron.

Alternatively, absent an appropriate coworker comparator, a plaintiff can persuade the court of a discriminatory motive by demonstrating the defendant has "shifted its explanation of the employment decision." Lake, 596 F.3d at 874.   Dr. Condron argues Avera has shifted its explanation by giving inconsistent, evasive testimony. Doc. 57 at 26–27.   To support this claim, he refers to the depositions of Mathison, Henderson, Bare, and Doctors Post, Hill Jensen, Hurley, and Towner Lapp, which all include times when the deponent was unable to remember the circumstances of a conversation or the contents of a meeting. Doc. 57 at 16–17.   These interactions, however, were from two years before the depositions.[9]  Even viewing the evidence in the light most favorable to Dr. Condron, it is difficult to agree with his contention that a lack of memory of a meeting from two years ago is tantamount to shifting the explanation of the employment decision. See Lake, 596 F.3d at 874.

Having failed to identify policy violations, similarly situated coworkers, or shifting of the explanation of the employment decision from which this Court could infer Avera's proffered reasons are pretextual, Dr. Condron makes a final attempt to raise a material issue of fact regarding

---

[9] The meeting on which Dr. Condron most heavily relies for this contention occurred on July 28, 2020. Doc. 57 at 16. The depositions in question occurred between July 26, 2022 (Henderson) and October 5, 2022 (Dr. Towner Lapp). Doc. 56-2, -3, -4, -9, -10, -13, -14.

pretext and discriminatory motive by turning to Mathison's comments for a third time. Again, Mathison's statements alone cannot serve as the primary evidentiary basis for linking Dr. Condron's termination of employment to discriminatory intent. Dr. Condron presents no additional evidence to connect his firing with discrimination than he did when attempting to make the prima facie case. The evidence was not enough to show discrimination at that stage of the analysis; in light of Avera's nondiscriminatory reasons, it is certainly not enough now. See Sprenger, 253 F.3d at 1111 ("An employee's attempt to prove pretext or actual discrimination requires more substantial evidence, however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification.").

Dr. Condron has not produced enough evidence for a reasonable fact-finder to determine Avera's termination of his employment was "based on" his disability or productivity rather than on Dr. Condron's interpersonal relationships and the overall work environment surrounding his employment at Avera. Avera's treatment of other employees, testimony in the record, and statements from Mathison fail to create such an inference. When viewed in the light most favorable to Dr. Condron, the record fails to raise a genuine issue of material fact to suggest Avera's legitimate, nondiscriminatory reasons for terminating him were pretextual. Accordingly, Avera is entitled to summary judgment on Dr. Condron's disability discrimination claims, Counts 1 and 2 of this action.

**B. Count 8: Defamation**

Having determined Dr. Condron's disability discrimination claims cannot survive summary judgment, the only remaining claim is Dr. Condron's state law defamation claim against Dr. Hurley and Avera. The defamation claim was initially brought within this Court's jurisdiction

21

under the supplemental jurisdiction statute, 28 U.S.C. § 1367, with federal jurisdiction invoked under the ADA and the Family and Medical Leave Act.  See Doc. 1 ¶ 17.

A district court can decline to exercise supplemental jurisdiction when the claims triggering federal jurisdiction are dismissed.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction . . . [if] the district court has dismissed all claims over which it has original jurisdiction"); Aldridge v. City of St. Louis, 75 F.4th 895, 901 (8th Cir. 2023).  "A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  Aldridge, 75 F.4th at 901 (quoting Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009)).  "District courts should consider such factors as 'the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims.'" Id. (quoting City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  Other relevant factors include "judicial economy, convenience, fairness, and comity."  Wilson v. Miller, 821 F.3d 963, 970 (8th Cir. 2016) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343 (1988)).

Here, unlike the state law disability discrimination claim, which is subject to the same analysis as the federal disability discrimination analysis, the state defamation claim does not involve similar or overlapping legal issues.  Declining jurisdiction over the claim does not prejudice Plaintiff in seeking relief in state court.  Accordingly, this Court declines to exercise supplemental jurisdiction over the remaining state law defamation claim.

Even if this Court were to exercise supplemental jurisdiction over the defamation claim or if Dr. Condron were to re-file and allege diversity jurisdiction, summary judgment likely would enter in favor of the Defendants.  Dr. Condron alleges Dr. Hurley and, through vicarious liability, Avera have defamed him by slander and libel.  Slander under South Dakota law is a (1) false and

22

(2) unprivileged (3) publication that (4) "tends directly to injure [the plaintiff] in respect to his office, profession, trade, or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profit." SDCL § 20-11-4.  Libel under South Dakota law is a (1) false and (2) unprivileged (3) publication (4) "which has a tendency to injure [plaintiff] in his occupation." SDCL § 20-11-3.  Libel also requires the publication to be by "writing, printing, picture, effigy, or other fixed representation to the eye." Id.

To be constitutionally actionable defamation, the statement must "contain[] an objectively verifiable assertion" of fact rather than consisting entirely of opinion.  Paint Brush Corp. v. Neu, 599 N.W.2d 384, 396 (S.D. 1999).  "A statement of fact is not shielded from an action for defamation by being [called a mere opinion,] but if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.  Id. at 395 n.10 (quoting Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997)).  Moreover, "statements that cannot reasonably be interpreted as stating actual facts about an individual" are protected. Milkovich v. Lorain J. Co., 497 U.S. 1, 20 (1990) (cleaned up and citation omitted).

Many courts also expressly indicate that rhetorical hyperbole, or language that intentionally overstates or exaggerates to make a point, is not actionable defamation.  See, e.g., Choice Homes, LLC v. Donner, 976 N.W.2d 187, 204 (Neb. 2022); Rogers v. Mroz, 502 P.3d 986, 992 (Ariz. 2022); Automated Transactions, LLC v. Am. Bankers Ass'n, 216 A.3d 71, 78 (N.H. 2019).  Although the South Dakota courts have yet to address the issue directly, considering rhetorical hyperbole as not actionable seems to fall within applicable South Dakota case law.  First, a

hyperbolic statement typically is not "objectively verifiable" when the purpose of hyperbole is to emphasize a point by making a factually exaggerated statement.  See Paint Brush Corp., 599 N.W.2d at 396.  Second, a hyperbolic remark made in such a manner or context that it could not be reasonably understood as a factual assertion "makes it plain that the speaker is expressing a subjective view[ or] interpretation" instead of an actionable defamatory statement. Id. at 395 n.10; see also Milkovich, 497 U.S. at 20 (finding "statements that cannot reasonably be interpreted as stating actual facts" are protected (cleaned up and citation omitted)).

Under South Dakota law, a statement is not defamatory when the statement is absolutely or conditionally privileged.  See Peterson v. City of Mitchell, 499 N.W.2d 911, 915 (S.D. 1993); SDCL § 20-11-5 (defining privileged communications).  A statement is conditionally privileged and, therefore, outside the scope of South Dakota's slander and libel statutes if the statement is made without malice "to a person interested therein, by one who is also interested." Peterson, 499 at 911 (discussing absolute and qualified privileges); SDCL § 20-11-5 (defining privileged communications); see also SDCL §§ 20-11-3 and -4 (defining slander and libel as "unprivileged publication[s]").  Importantly, this qualified privilege relies on the absence of malice; "[i]f malice exists, the actions exceed the privilege or constitute an abuse thereof." Tibke v. McDougall, 479 N.W.2d 898, 905 (S.D. 1992) (citing Bego v. Gordon, 407 N.W.2d 801 (S.D. 1987)).  Malice refers to a defendant's "reckless disregard for the truth" or situations where "the defendant entertained serious doubts as to the truth of his or her publications." Harvey v. Reg'l Health Network, Inc., 906 N.W.2d 382, 391 (S.D. 2017).  The plaintiff must make a "specific showing of malice for purposes of raising a genuine issue of material fact." Id. at 392 (cleaned up and citation omitted).

Here, Dr. Condron claims the following statements from Dr. Hurley were defamatory:

24

(1) Dr. Condron "continues to operate as a solo practitioner – he tells the group what he is

    going to do, no dialogue, zero communication."

(2) Dr. Condron "says he is going to do his thing and the group just has to accept that."

(3) Dr. Condron "doesn't talk to his direct partners, at all, ever."

(4) Dr. Condron has "no communication w/ partners-zero."

Doc. 56-27, -31 at 3. Defendants do not dispute that these statements were published when Dr.

Hurley made the comments to various Avera administrators or that they arguably tend to injure

Dr. Condron in his occupation by referring to his workplace conduct. The Defendants argue,

however, that the statements are not actionable.

      Here, the statements are, factually speaking, not entirely accurate; Dr. Condron did engage

in some dialogue and communication with other physicians at Avera. Nonetheless, it is difficult

to claim the statements are "false" in the context of a defamation suit where both the speaker and

the hearers were clearly aware of the circumstances surrounding the comment and the hyperbolic

nature of the statement. See Milkovich, 497 U.S. at 20 (finding "statements that cannot reasonably

be interpreted as stating actual facts" are protected (cleaned up and citation omitted)). Dr. Condron

had frequently and recently been in meetings with Dr. Hurley and the individuals to whom Dr.

Hurley made the allegedly defamatory remarks. In fact, Dr. Hurley made many of the allegedly

defamatory statements to Mathison and Bare immediately after they all attended a meeting where

Dr. Condron was present, participated, and communicated. Because none of the hearers could

possibly have believed Dr. Hurley meant his statement literally, all of them having been in joint

conversations and discussions with both Dr. Hurley and Dr. Condron, such statements could not

reasonably be considered a statement of fact for purposes of defamation. Rather, the statements

conveyed to Avera administrators Dr. Hurley's frustration with Dr. Condron surrounding what Dr.

Hurley perceived as aloofness, poor communication, and excessive independence from Dr. Condron. Accordingly, Dr. Condron likely has no viable claim against Dr. Hurley for libel or slander.

Dr. Condron's claim against Avera relies on vicarious liability arising from the employment relationship between Avera and Dr. Hurley. "The employer's vicarious liability is a function of status and stems entirely from the tortious conduct of the [employee], not from any tortious conduct by the [employer.]" Sheard v. Hattum, 965 N.W.2d 134, 143 (S.D. 2021). Because Dr. Hurley appears not to have made statements creating an actionable defamation claim and cannot be held liable for his remarks, Avera cannot be held liable, either. See id. (explaining the negligence claim against the employer must fail because the claim against the employee failed).

Therefore, this Court, if it were to exercise supplemental jurisdiction over the action, would likely grant Defendants' motion for summary judgment.

## IV.    Conclusion

Dr. Condron has failed to demonstrate any direct evidence of disability discrimination to survive summary judgment on his ADA or SDHRA claims. Further, the indirect evidence of disability discrimination Dr. Condron presents cannot link his firing to discriminatory motive without resorting to speculation or asking the Court to make unreasonable inferences in his favor. Therefore, unable to show a causal connection between his disability and the adverse employment action suffered, Dr. Condron has failed to make a prima facie case of employment discrimination under the McDonnell Douglas burden-shifting analysis. Having determined summary judgment on Dr. Condron's federal disability discrimination claim, from which federal jurisdiction originates, and state disability discrimination claim is appropriate, this Court declines to exercise

supplemental jurisdiction over the remaining state law defamation claim.  Even if this Court were to exercise such jurisdiction, it would grant summary judgment on the defamation claim.

Accordingly, it is

ORDERED that Defendants' Motion for Summary Judgment, Doc. 36, is granted and that summary judgment in favor of Defendant enters on Plaintiff's disability discrimination claims, Claims 1 and 2.  It is further

ORDERED that Plaintiff's state law defamation claim, Claim 8, against Dr. Hurley and Avera is dismissed without prejudice under 28 U.S.C. § 1367(c)(3).

DATED this  29ᵗʰ  day of September, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

27